[Cite as *In re N.H.*, 2014-Ohio-4047.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
ATHENS COUNTY

IN THE MATTER OF:                        :
                                         :
        N.H.,                            :
                                         :
                                         :
                                         :
        Adjudicated Dependent            :
         Child.                          : Case No. 14CA17
                                         :
                                         :
                                         : DECISION AND JUDGMENT ENTRY
                                         :

_____

APPEARANCES:

COUNSEL FOR APPELLANT:        Thomas L. Cornn, 8 North Court Street, Suite 407, Athens,
                             Ohio 45701

COUNSEL FOR APPELLEE:         Keller J. Blackburn, Athens County Prosecuting Attorney,
                             and Sabrina J. Ennis, Athens County Assistant Prosecuting
                             Attorney, P.O. Box 1046, Athens, Ohio   45701

_____

CIVIL APPEAL FROM COMMON PLEAS COURT, JUVENILE DIVISION
DATE JOURNALIZED: 9-11-14
ABELE, P.J.

{¶ 1}   This is an appeal from an Athens County Common Pleas Court, Juvenile
Division, judgment that awarded Athens County Children Services (ACCS) permanent custody
of N.H.   Appellant, N.H.'s biological mother, raises the following assignment of error for
review:

> "ATHENS COUNTY CHILDREN SERVICES FAILED TO
> PROVE BY CLEAR AND CONVINCING EVIDENCE THAT
> MOTHER FAILED TO SUBSTANTIALLY REMEDY HER
> SUBSTANCE ABUSE PROBLEM AND THAT HER
> DAUGHTER COULD NOT BE PLACED WITH HER WITHIN
> A REASONABLE PERIOD OF TIME."

{¶ 2}   On October 23, 2012, appellant gave birth to N.H.   Shortly thereafter, tests

revealed that the newborn child had drugs in her system:   Benzodiazepines, oxyazepam,

temezepam, nordiazepam, diazepam, hydrocodone, and marijuana.   Approximately one month

later, the trial court granted the appellee emergency temporary custody.

{¶ 3} On November 29, 2012, appellee filed a complaint and alleged that the child is an abused, neglected, and dependent child. On January 31, 2013, the trial court adjudicated the child a dependent child, and subsequently placed her child in appellee's temporary custody.

{¶ 4} On January 13, 2014, appellee filed a motion to modify the disposition to permanent custody. On April 15, 2014, the trial court held a hearing to consider appellee's motion. ACCS caseworker Tara Carsey testified that when she began to work with appellant, appellant's substance abuse presented the primary concern. Carsey further indicated that appellee had concerns regarding appellant's mental health (appellant had been diagnosed with borderline personality disorder, progressive mood disorder, and bipolar schizophrenic tendencies) and her ability to appropriately care for her special needs child. Carsey stated that appellant lost her housing during the pendency of the case, and that appellee added a requirement to appellant's case plan to obtain safe and stable housing.

{¶ 5} Carsey testified that appellant initially denied that she had a substance abuse problem. Carsey explained, however, that appellant had three positive cocaine drug screens. Yet, appellant denied that she ever used cocaine. Carsey stated that appellant did not believe that she needed substance abuse counseling, and appellant did not complete the recommended substance abuse treatment plan. Carsey further explained that appellant did not comply with substance abuse counseling until November 2013, when the municipal court ordered her to complete the court's drug offender program as part of her sentence.

{¶ 6} Carsey also explained that on September 3, 2013, appellant married Andrew Hutchins, a convicted felon with a child endangering conviction. When Carsey asked appellant

about the marriage, appellant denied that she had married Hutchins. Carsey, however, informed appellant that Carsey saw the marriage record at the courthouse. At that point, appellant admitted that she had married Hutchins. Carsey advised appellant that appellee had concerns about appellant's marriage to Hutchins due to his child endangering conviction. Carsey stated that appellant was not concerned about Hutchins' conviction. Carsey opined that the child's safety would be at risk if the child lived in a home with Hutchins.

{¶ 7} Carsey also testified that until appellant was incarcerated, appellant consistently visited with the child. More recently, however, appellant's visits have not been consistent. Carsey explained that appellant canceled both visits the week before the permanent custody hearing.

{¶ 8} Carsey stated that she believes that awarding appellee permanent custody is in child's best interest:

> "[The child] is very young and she is unable to protect herself or provide for her own basic needs let alone her special needs including the therapy and the things that she can address and I'm not certain that [appellant] will be able to maintain her own life of sobriety and provide those things for [the child]. So, I feel like she needs to be in a safe home that can insure that she has those things that she needs."

{¶ 9} The child's guardian ad litem likewise testified that she believes that awarding appellee permanent custody is in the child's best interest. The guardian ad litem (1) stated that appellant has not adequately addressed her substance abuse problems; (2) noted that appellant married a man who has a child endangering conviction; (3) cited appellant's inability to maintain a stable home as a factor that led to her belief that awarding appellee permanent custody would serve the child's best interest; and (4) stated that appellant has lived in six different residences

since February 2013.

{¶ 10} Michelle Ruby, the child's occupational therapist, testified that she started to work with the child to address "some sensory processing issues." Ruby explained that the child has a dysfunction in her sensory processing, which in plain terms, means that the child crashes into objects and has a low registration for pain stimulus. Ruby stated that the child also has "some tactile defensiveness." Ruby explained that the child became upset, for example, if she experienced a sudden change in temperature and that the child also has problems with food textures.

{¶ 11} Ruby testified that she typically sees the child once per week. She stated that for the therapy to be the most effective, the child's caregiver should follow daily home treatment recommendations. Ruby explained that she currently gives the child's foster mother treatment recommendations and that the foster mother appears to follow those recommendations.

{¶ 12} Ruby further stated that appellant has attended about four or five appointments, and that appellant last attended an appointment approximately four or six weeks before the permanent custody hearing. Ruby testified that if the child were returned to appellant's care, appellant would need to be aware of the therapy the child received during the appointments and would also need to practice home treatment recommendations.

{¶ 13} Sara Needler, the child's physical therapist, stated that when the child initially was evaluated in September 2013, the child was not walking and moved with "extensor movement patterns" and exhibited "kind of this rigid straightening of the body rather than flexing and

rotating."   Needler explained that in order for the child to progress, the child's caregiver must follow the recommended home exercise program.   Needler stated that appellant has not regularly attended the child's physical therapy appointments and that appellant last attended an appointment in September 2013.

{¶ 14} Appellant's probation officer, Brice Johnson, testified that appellant's probation requires her to report to him, to complete counseling, to attend probation status update hearings, and to remain drug and alcohol free.   Johnson explained that appellant participates in the Substance Abuse and Mental Illness (SAMI) program administered through the municipal court and that the programs takes at least twelve months to complete.   Johnson stated that the SAMI program is based on an individual's progress and that some offenders need more than twelve months to complete the program.

{¶ 15} Johnson testified that he performs drug screens and during the five or six months that he worked with appellant, she failed to provide a sample for one of the drug screens, and another time, appellant admitted to "THC use."

{¶ 16} Johnson also explained that appellant had problems complying with her probation.  Johnson testified that he spoke with appellant about her counseling, and appellant "always [had] some reason or excuse for when she doesn't show up."   He stated that many of her missed counseling sessions were due to a lack of transportation.   He explained that appellant claimed to have transportation difficulties, "even though her schedule is setup [sic] weekly in advance."

{¶ 17} The child's foster mother testified that the child has been in her home since November 28, 2012.   She explained that the child has special needs and receives occupational therapy every week and physical therapy every other week.   The foster mother stated that the child had received speech therapy once per week, but stopped the therapy when the child was

about thirteen or fourteen months old.   The foster mother reported that the therapies improved the child's sleeping and eating habits and also improved her physical movements.

{¶ 18} The foster mother also testified that appellant has missed some visits with the child.   She explained that the child needs ongoing care, a consistent routine, and continued therapy.

Appellant testified that she presently lives with her father and brother and that she plans to move into a mobile home on her father's property.   Appellant stated that she started to date Andrew Hutchins on April 7, 2013 and appellee terminated her home visits with the child when Hutchins started sleeping in her home.   Appellant admitted that when the appellee asked if she was in a relationship with Hutchins, she initially denied it.

{¶ 19} Appellant also explained that she was arrested in October 2013 for petty theft and for having a positive drug screen.   Around the same time as her arrest, the house where she had lived between November 2012 through August 2013 (and where Hutchins had also stayed with her) caught fire, allegedly due to the presence of a methamphetamine lab.   Appellant stated that she had not been living in the home at the time of the fire and that she did not have any knowledge of a meth lab.   Appellant testified that Hutchins subsequently was arrested for violating his probation imposed for a child endangering charge and was also arrested for possession of chemicals used in the manufacture of methamphetamine.

{¶ 20} Appellant stated that the ACCS caseworker told her about Hutchins' child endangering conviction, but explained: "I've known him for a long time and we take care, he's got a baby sister that's two weeks younger than [N.H.] that was actually living in the household with us that we cared for, her and his two other sisters."   Appellant indicated that she knew others had concerns about the child's safety around Hutchins, but she noted that Hutchins presently is incarcerated.   Appellant stated that she intends to continue her relationship with

Hutchins, if he "can stay clean." She further explained that if Hutchins lived with her and the child, she would not leave Hutchins alone with the child. When appellee's counsel asked appellant if she had "any concerns about [Hutchins'] child endangerment charge," appellant responded, "No."

{¶ 21} Appellant admitted that she formerly had a substance abuse problem, but claims that she has "been clean" and plans to remain "that way." She further admitted, however, that she recently had some positive drug screens. Appellant explained that she had positive drug screens because she has "a lot on [her] mind [and she] just really want[s her] daughter back." She testified that she did not admit that she had a substance abuse problem until after her October 2013 arrest and subsequent incarceration.

{¶ 22} Appellant stated that the appellee helped her with transportation, but she lost that privilege for failing to comply with appellee's transportation policies. She additionally stated that the week before the permanent custody hearing, she missed her visits with the child due to "family problems." Appellant explained that she used to have home visits with the child, but she lost them once Hutchins began to sleep in her bed. Appellant admitted that she knew she was not supposed to have anyone else present during her home visits and knew that appellee had concerns about Hutchins, but she nevertheless allowed Hutchins in her home.

{¶ 23} Appellant stated that she is also aware the child needs continuing occupational and physical therapy, but claimed that she would go to the appointments if she had transportation. Appellant testified that she believes that appellee should allow her additional time to obtain independent housing and to prove that she can care for her daughter.

{¶ 24} On April 28, 2014, the trial court awarded appellee permanent custody of the then eighteen-month-old child. The court noted that appellant:

"is on probation with the Municipal Court for multiple offenses including a probation violation, and new theft conviction occurring during this Court's involvement in her life.   She is part of a specialized docket called 'SAMI', for offenders with histories of substance abuse and mental illness.   She readily acknowledges a history of opiate abuse, and multiple mental health diagnoses including bi-polar disorder with schizophrenic tendencies, depression, and anxiety disorder.   She reports being currently free of drugs of abuse, and taking her prescribed psychotropic medications, Xanax, Lamictal, and Seroquel."

The court further observed that appellant "reoffended criminally" while the case was pending and married a man she barely knew who also has a criminal history and was imprisoned at the time of the permanent custody hearing.

{¶ 25} The trial court also considered the best interest factors.   Regarding the child's interactions and interrelationships, the court noted:

"[The child] was removed from her mother at age one month.   She has lived continuously with the same foster family since then and is now eighteen months of age.   She is well bonded to her foster family[;] however, this is not a 'foster to adopt' situation. [Appellant] has always been provided opportunity to visit and at one point, visits were arranged to be in mother's home.   Mother's attendance at visits has been sporadic, and visits in her home were ended when she lied about having married Mr. Hutchins, and lied about his presence in the home.   Mother and child evidence a bond when together, but that bond alone is inadequate to protect this child and her special needs.   There are no other family members who can or will play a meaningful role in this child's life."

{¶ 26} The court observed that the child is too young to express her wishes.

{¶ 27} With respect to the child's custodial history, the trial court observed that (1) the child was adjudicated dependent on January 31, 2013, (2) the child first entered ACCS's emergency temporary custody on November 28, 2012, and (3) appellee filed its permanent custody motion on January 13, 2014.   The court thus found that the child had not been in appellee's temporary custody for at least twelve of the past twenty-two months pursuant to R.C.

2151.414(B)(1)(d).

{¶ 28} Regarding the child's need for a legally secure permanent placement and whether

it can be achieved without granting appellee permanent custody, the trial court stated:

{¶ 29} "This child with special needs deserves a legally secure placement, and
this Court believes that such a placement can only be accomplished with an award of
permanent custody to ACCS and the termination of parental rights.   Mother and father
are inappropriate for placement or custody, and there are no suitable family members
willing or able to be considered.   This child is clearly adoptable, and has every
opportunity to thrive in a family setting."

{¶ 30} The trial court also found that the child cannot or should not be placed with either

parent.   The court determined that R.C. 2151.414(E)(1) applied, i.e., appellant continuously and

repeatedly failed to remedy the conditions that led to the child's removal.   The court explained:

"For most of this case [appellant] has been in denial and/or simply lying
about her condition and circumstances.   Only since her most recent criminal
convictions intervention [sic] and the substantial structure of the 'SAMI' program
does she appear to even be willing to address her own individual needs.   Even
there she still has a minimum of six months more intensive programming to try to
avoid additional incarceration of more than five months.   Currently, mother is
acknowledging her shortcomings and promising to address them, but her history
with the agency and the Court system do not provide adequate assurances.   Sadly,
mother clearly loves her daughter and desperately wants another chance to try to
keep her own life together and have custody of this child.   There is clearly natural
love for her daughter.   However, the care, protection, and mental and physical
development of this child dictate the decision in this matter."

{¶ 31} The trial court determined that the father abandoned the child.   The court also

noted that the father is in prison and is expected to remain in prison for several more years.

{¶ 32} The trial court additionally found another relevant factor why the child cannot or

should not be returned to appellant:

"[The child] has medical conditions requiring occupational therapy, and physical
therapy, and will need to regularly attend medical appointments, and be
administered therapeutic exercise between such sessions.   Mother has rarely
attended these appointments, and while mother is technically capable of providing
the exercises, her lack of involvement and inconsistencies indicate that her care

would be inadequate."

The court thus determined that awarding appellee permanent custody would be in the child's best interest.   This appeal followed.

{¶ 33} In her sole assignment of error, appellant in essence contends that the trial court's judgment to award the appellee permanent custody is against the manifest weight of the evidence.   In particular, she asserts that clear and convincing evidence fails to support the trial court's finding that appellant failed to substantially remedy the conditions that led to the child's removal and that the child cannot be returned to appellant's care within a reasonable time.

A

STANDARD OF REVIEW

{¶ 34} A reviewing court generally will not disturb a trial court's permanent custody decision unless the decision is against the manifest weight of the evidence.   In re B.E., 4th Dist. Highland No. 13CA26, 2014-Ohio-3178, ¶27; In re R.S., 4th Dist. Highland No. 13CA22, 2013-Ohio-5569, ¶29.

> "'Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other.   It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them.   Weight is not a question of mathematics, but depends on its effect in inducing belief.""'

Eastley v. Volkman, 132 Ohio St.3d 328, 2012–Ohio–2179, 972 N.E.2d 517, ¶12, quoting State v. Thompkins, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting Black's Law Dictionary 1594 (6th ed.1990).

{¶ 35} When an appellate court reviews whether a trial court's permanent custody

decision is against the manifest weight of the evidence, the court "'"weighs the evidence and all

reasonable inferences, considers the credibility of witnesses and determines whether in resolving

conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest

miscarriage of justice that the [judgment] must be reversed and a new trial ordered.'''"   Eastley

at ¶20, quoting Tewarson v. Simon, 141 Ohio App.3d 103, 115, 750 N.E.2d 176 (9th  Dist.

2001), quoting Thompkins, 78 Ohio St.3d at 387, 678 N.E.2d 541, quoting State v. Martin, 20

Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist. 1983).   Accord In re Pittman, 9th Dist. Summit

No. 20894, 2002–Ohio–2208, ¶¶23–24.

{¶ 36}  The essential question that we must resolve when reviewing a permanent custody

decision under the manifest weight of the evidence standard is "whether the juvenile court's

findings * * * were supported by clear and convincing evidence."   In re K.H., 119 Ohio St.3d

538, 2008–Ohio–4825, 895 N.E.2d 809, ¶43.   "Clear and convincing evidence" is:

> "The measure or degree of proof that will produce in the mind of the trier of fact a
> firm belief or conviction as to the allegations sought to be established.   It is
> intermediate, being more than a mere preponderance, but not to the extent of such
> certainty as required beyond a reasonable doubt as in criminal cases.   It does not
> mean clear and unequivocal."

In re Estate of Haynes, 25 Ohio St.3d 101, 103–04, 495 N.E.2d 23 (1986).   In determining

whether a trial court based its decision upon clear and convincing evidence, "a reviewing court

will examine the record to determine whether the trier of facts had sufficient evidence before it to

satisfy the requisite degree of proof."   State v. Schiebel, 55 Ohio St.3d 71, 74, 564 N.E.2d 54

(1990).   Accord In re Holcomb, 18 Ohio St.3d 361, 368, 481 N.E.2d 613 (1985), citing Cross v.

Ledford, 161 Ohio St. 469, 120 N.E.2d 118 (1954) ("Once the clear and convincing standard has

been met to the satisfaction of the [trial] court, the reviewing court must examine the record and

determine if the trier of fact had sufficient evidence before it to satisfy this burden of proof."). Accord In re Adoption of Lay, 25 Ohio St.3d 41, 42–43, 495 N.E.2d 9 (1986). Cf. In re Adoption of Masa, 23 Ohio St.3d 163, 165, 492 N.E.2d 140 (1986) (stating that whether a fact has been "proven by clear and convincing evidence in a particular case is a determination for the [trial] court and will not be disturbed on appeal unless such determination is against the manifest weight of the evidence"). Thus, if the children services agency presented competent and credible evidence upon which the trier of fact reasonably could have formed a firm belief that permanent custody is warranted, then the court's decision is not against the manifest weight of the evidence. In re R.M., 4th Dist. Athens Nos. 12CA43 and 12CA44, 2013–Ohio–3588, ¶62; In re R.L., 2nd Dist. Greene Nos. 2012CA32 and 2012CA33, 2012–Ohio–6049, ¶17, quoting In re A.U., 2nd Dist. Montgomery No. 22287, 2008–Ohio–187, ¶9 ("A reviewing court will not overturn a court's grant of permanent custody to the state as being contrary to the manifest weight of the evidence 'if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements * * * have been established.'"). Once the reviewing court finishes its examination, the court may reverse the judgment only if it appears that the fact-finder, when resolving the conflicts in evidence, "'clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.'" Thompkins, 78 Ohio St.3d at 387, 678 N.E.2d 541, quoting State v. Martin, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). A reviewing court should find a trial court's permanent custody decision against the manifest weight of the evidence only in the "'exceptional case in which the evidence weighs heavily against the [decision].'" Thompkins, 78 Ohio St.3d at 387, 678 N.E.2d 541, quoting Martin, 20 Ohio

App.3d at 175, 485 N.E.2d 717; accord State v. Lindsey, 87 Ohio St.3d 479, 483, 721 N.E.2d

995 (2000).

{¶ 37} Furthermore, when reviewing evidence under the manifest weight of the evidence

standard, an appellate court generally must defer to the fact-finder's credibility determinations.

Eastley at ¶21.   As the Eastley court explained:

> "'[I]n determining whether the judgment below is manifestly against the weight of
> the evidence, every reasonable intendment must be made in favor of the judgment
> and the finding of facts. * * *
>         If the evidence is susceptible of more than one construction, the reviewing
> court is bound to give it that interpretation which is consistent with the verdict and
> judgment, most favorable to sustaining the verdict and judgment.'"

Id., quoting Seasons Coal Co., Inc. v. Cleveland, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984),

fn.3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 60, at 191–192 (1978).

{¶ 38} Moreover, as this court previously explained in State v. Murphy, 4th Dist. Ross

No. 07CA2953, 2008–Ohio–1744, ¶31:

> "It is the trier of fact's role to determine what evidence is the most credible and
> convincing.   The fact finder is charged with the duty of choosing between two
> competing versions of events, both of which are plausible and have some factual
> support.   Our role is simply to insure the decision is based upon reason and fact.
> We do not second guess a decision that has some basis in these two factors, even
> if we might see matters differently."

Accord Bugg v. Fancher, 4th Dist. Highland No. 06CA12, 2007–Ohio–2019, ¶9.   Additionally,

deferring to the trial court on matters of credibility is "crucial in a child custody case, where there

may be much evident in the parties' demeanor and attitude that does not translate to the record

well (Emphasis sic)."   Davis v. Flickinger, 77 Ohio St.3d 415, 419, 674 N.E.2d 1159 (1997).

Accord In re Christian, 4th Dist. Athens No. 04CA10, 2004–Ohio–3146, ¶7.   As the Ohio

Supreme Court long-ago explained:   "In proceedings involving the custody and welfare of

children the power of the trial court to exercise discretion is peculiarly important.   The

knowledge obtained through contact with and observation of the parties and through independent investigation can not be conveyed to a reviewing court by printed record." Trickey v. Trickey, 158 Ohio St. 9, 13, 106 N.E.2d 772 (1952). Furthermore, unlike an ordinary civil proceeding in which a jury has no contact with the parties before a trial, in a permanent custody case, a trial court judge may have significant contact with the parties before a permanent custody motion is even filed. In such a situation, it is not unreasonable to presume that the trial court judge had far more opportunities to evaluate the credibility, demeanor, attitude, etc., of the parties than this court ever could from a mere reading of the permanent custody hearing transcript.

### BPERMANENT CUSTODY PRINCIPLES

{¶ 39} A parent has a "fundamental liberty interest" in the care, custody, and management of his or her child and an "essential" and "basic civil right" to raise his or her children. Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); In re Murray, 52 Ohio St.3d 155, 156, 556 N.E.2d 1169 (1990); accord In re D.A., 113 Ohio St.3d 88, 2007–Ohio–1105, 862 N.E.2d 829. A parent's rights, however, are not absolute. D.A. at ¶11. Rather, "'it is plain that the natural rights of a parent * * * are always subject to the ultimate welfare of the child, which is the pole star or controlling principle to be observed.'" In re Cunningham, 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (1979), quoting In re R.J.C., 300 So.2d 54, 58 (Fla.App.1974). Thus, the state may terminate parental rights when a child's best interest demands such termination. D.A. at ¶11.

{¶ 40} Before a court may award a children services agency permanent custody of a child, R.C. 2151.414(A)(1) requires the court to hold a hearing. The primary purpose of the hearing is to allow the court to determine whether the child's best interests would be served by

permanently terminating the parental relationship and by awarding permanent custody to the

agency.   See R.C. 2151.414(A)(1).   Additionally, when considering whether to grant a children

services agency permanent custody, a trial court should consider the underlying principles of

R.C. Chapter 2151:

> (A) To provide for the care, protection, and mental and physical development of children * * *;
> * * *
> (B) To achieve the foregoing purpose[], whenever possible, in a family environment, separating the child from its parents only when necessary for his welfare or in the interests of public safety.

C

PERMANENT CUSTODY FRAMEWORK

**{¶ 41}**  R.C. 2151.414(B)(1) permits a trial court to grant permanent custody of a child to

a children services agency if the court determines, by clear and convincing evidence, that the

child's best interest would be served by the award of permanent custody and that:

> (a) The child is not abandoned or orphaned or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
> (b) The child is abandoned.
> (c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.
> (d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999.

**{¶ 42}**  Thus, before a trial court may award a children services agency permanent

custody, it must find (1) that one of the circumstances described in R.C. 2151.414(B)(1) applies,

and (2) that awarding the children services agency permanent custody would further the child's

best interests.

{¶ 43} In the case at bar, appellant does not specifically argue that the trial court's best interest finding is against the manifest weight of the evidence. Thus, we do not address it. Instead, appellant argues that clear and convincing evidence does not support the trial court's R.C. 2151.414(B)(1)(a) finding that the child cannot or should not be returned to her within a reasonable time.

D

R.C. 2151.414(E)

{¶ 44} R.C. 2151.414(E) governs a trial court's analysis of whether a child cannot or should not be returned to a parent within a reasonable time. The statute requires the trial court to consider "all relevant evidence" and sets forth the factors a trial court must consider in determining whether a child cannot or should not be placed with either parent within a reasonable time. As relevant in the case at bar, if the court finds the existence of any one of the following factors, "the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent":

> (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

{¶ 45} In the case at bar, we believe that the record contains ample clear and convincing evidence to support the trial court's finding that the child cannot or should not be returned to

appellant within a reasonable time. The evidence supports the trial court's finding that appellant failed continuously and repeatedly to substantially remedy the conditions that led to the child's removal. Appellant continued to have positive drug screens while the case was pending. Only after the municipal court ordered appellant into its drug offender program did she begin to address her substance abuse problem. Appellant had nearly one year between the time when the appellee initially removed her child and the time she was ordered into the court's SAMI program to address her substance abuse problem, but she failed to do so. For nearly one year, appellant failed continuously and repeatedly to remedy her substance abuse problem. She did not seek substance abuse counseling of her own free will, but only did so because the municipal court ordered her to do so. Even after appellant began the SAMI program, she continued to have positive drug screens and admitted that the stress of the permanent custody proceeding caused her some relapses. Furthermore, as the trial court noted appellant still has "a minimum of six months more intensive programming to try to avoid additional incarceration of more than five months."

{¶ 46} Additionally, appellant continuously and repeatedly failed to remedy her lack of a safe and stable home for the child. The guardian ad litem stated that appellant had six different residences between February 2013 and the time of the permanent custody hearing. Moreover, during the pendency of the case, appellant married a man who had a child endangering conviction and lived with him for a time. She refused to recognize that his child endangering conviction presented a concern for the child's safety. At the time of the permanent custody hearing, appellant stated that she would be moving into a mobile home on her father's property. However, that home sat empty for over one year before the permanent custody hearing, and appellant did not show why she could not establish it as a safe and stable permanent within that

time frame.

{¶ 47} The evidence also shows that appellee provided reasonable case planning and diligent efforts to assist appellant to remedy her problems. The evidence further shows, however, that appellant failed to fully avail herself of those services and to address her substance abuse problem. Moreover, although appellant claims that she will now comply with substance abuse counseling and maintain sobriety in order to provide her child with a safe and stable home, appellant had more than one year to maintain sobriety before appellee filed for permanent custody. Appellant, however, failed to do so. Furthermore, as the trial court found, "[f]or most of this case [appellant] has been in denial and/or simply lying about her condition and circumstances."

{¶ 48} We fully recognize that appellant loves her child and has finally begun to address her substance abuse problem through the court-ordered program. However, appellant did not attempt to resolve her substance abuse counseling when the appellee made it a case plan requirement in order to be reunified with her child. Instead, the threat of being incarcerated (not the threat of losing her child) caused her to seek substance abuse counseling. Additionally, as the trial court noted, appellant remained in denial throughout the majority of the case. Had appellant been fully committed to being reunited with her child, she would have sought substance abuse counseling long before the court ordered it. Consequently, we do not agree with appellant that clear and convincing evidence fails to support the trial court's finding that appellant failed to continuously and substantially remedy the conditions that led to the child's removal.

{¶ 49} Furthermore, to the extent that appellant argues that her recent admission to the SAMI program shows that she has substantially remedied her substance abuse problem, appellant

has not completed the SAMI program and will be in the program for at least several more months

or until she demonstrates progress.   While we commend appellant for finally undergoing

substance abuse counseling, she cannot guarantee that she will successfully complete the SAMI

program or that she will remain drug-free.   Indeed, her past history indicates that when given a

choice, she chose to abuse drugs rather than comply with the case plan in order to be reunited

with her child.   This court has recognized that:

> "' * * * [A] child should not have to endure the inevitable to its great
> detriment and harm in order to give the * * * [parent] an opportunity to prove her
> suitability.   To anticipate the future, however, is at most, a difficult basis for a
> judicial determination.   The child's present condition and environment is the
> subject for decision not the expected or anticipated behavior of unsuitability or
> unfitness of the * * * [parent]. * * *   The law does not require the court to
> experiment with the child's welfare to see if he will suffer great detriment or
> harm.'"

In re Bishop, 36 Ohio App.3d 123, 126, 521 N.E.2d 838 (5th Dist. 1987), quoting In re East, 32

Ohio Misc. 65, 69, 288 N.E.2d 343, 346 (1972).

{¶ 50}  As we indicated, appellant demonstrated that she is unable to refrain from abusing

drugs, even though abstaining from drugs was a condition of being reunited with her child.   A

mother who truly desires custody of her child would, we believe, make every effort to comply

with a children services agency's request to refrain from illegal drug use.   In sum, appellant

failed to show that she could–without court-intervention–dedicate herself to the child's best

interests.   We cannot fault the trial court for deciding not to experiment with a fragile, special

needs eighteen-month-old child in order to provide appellant an opportunity to prove her ability

to remain drug-free and to give the child proper care, stability, support, and permanency.

{¶ 51}  Moreover, we observe that the trial court also considered appellant's failure to

consistently attend and be involved in the child's occupational and physical therapy appointments

as a reason why the child cannot or should not be returned to appellant within a reasonable time. The court observed that appellant "rarely attended" the child's appointments and determined that appellant's "lack of involvement and inconsistencies indicate that her care would be inadequate." The evidence presented at the permanent custody hearing plainly shows that the child has special needs and requires continuing treatment both in the home and through her therapy appointments. The evidence supports the court's finding that appellant would not be able to fulfill the child's special needs.

{¶ 52} Consequently, for all of the above reasons, we conclude that clear and convincing evidence supports the trial court's finding that the child cannot or should not be returned to appellant within a reasonable time. Accordingly, based upon the foregoing reasons, we hereby overrule appellant's sole assignment of error and affirm the trial court's judgment.

JUDGMENT AFFIRMED.

JUDGMENT ENTRY

It is ordered that the judgment be affirmed and that appellee shall recover of appellant the costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Athens County Common Pleas Court, Juvenile Division, to carry this judgment into execution.

A certified copy of this entry shall constitute that mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

McFarland, J. & Hoover, J.: Concur in Judgment & Opinion

For the Court

BY:_____
Peter B. Abele
Presiding Judge

**NOTICE TO COUNSEL**

Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.